# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **DONALD G. RUSHING,** ) | |
| ) | |
| Plaintiff, ) | Case No. 1:06CV00091 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By: James P. Jones |
| **COMMISSIONER OF SOCIAL** ) | Chief United States District Judge |
| **SECURITY**, ) | |
| ) | |
| Defendant. ) | |

*Gregory R. Herrell, Arrington Schelin & Herrell, P.C., Bristol, Virginia, for Plaintiff; Sara Bugbee Winn, Assistant United States Attorney, Roanoke, Virginia, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Donald G. Rushing filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2007). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

The plaintiff protectively filed for DIB on July 23, 2004, alleging disability beginning October 30, 2003, due to epilepsy and lower back pain. (R. at 74-79, 82-83.) His application was denied initially on October 20, 2004 (R. at 54-58), and upon reconsideration on January 27, 2005 (R. at 61-63). At his request, the plaintiff received a hearing before an administrative law judge ("ALJ") on November 8, 2005. (R. at 34-51.) The plaintiff, who was present and represented by counsel, testified at this hearing and stated that his depression or bipolar disorder was one of his chief complaints. (R. at 38.) Consequently, the ALJ had the plaintiff undergo a consultative psychological evaluation following the hearing. (R. at 172-77.) The ALJ then held a second hearing on April 18, 2006 at which the plaintiff again testified. (R. at 22-33.) By decision dated May 10, 2006, the ALJ denied the plaintiff's claim for DIB. (R. at 9-18.)

-2-

Case 1:06-cv-00091-JPJ-PMS   Document 23   Filed 01/09/08   Page 2 of 18   Pageid#: 94

The plaintiff filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council ("Appeals Council") (R. at 8), but on July 13, 2006, the Appeals Council denied the plaintiff's request for review. (R. at 4-7.) Thus, the ALJ's opinion constitutes the final decision of the Commissioner. The plaintiff then filed a complaint with this court on September 13, 2006, objecting to the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is now ripe for decision.

II

The summary judgment record reveals the following facts. The plaintiff was forty-four years old at the time of the ALJ's decision, making him a younger individual under the Commissioner's Regulations. *See* 20 C.F.R. § 404.1563(c) (2007). He received a general equivalency diploma while he was in the United States Marine Corps and has worked as a manager for a trucking company and as a cell phone company customer service representative. (R. at 37-38, 83-84.) In his managerial role with the trucking company, he supervised over one hundred workers. (R. at 84.)

The plaintiff claims disability in part due to epilepsy. (R. at 82-83.) His medical records indicate that he has been treated for seizures, but that he has not experienced a seizure in several years. (R. at 121, 171.) On the recommendation of his primary care physician William M. Handy, M.D., the plaintiff underwent an overnight polysomnography study on January 14, 2004, to test for possible obstructive sleep apnea syndrome. (R. at 130-33.) The study results indicated the possibility that his seizure disorder was causing his recurrent sleep problems. (R. at 132.) An awaking electroencephalography ("EEG") recording was performed on January 26, 2004, to determine whether the plaintiff suffered from seizures. (R. at 127.) However, this EEG yielded normal results. (*Id.*) At an appointment with Dr. Handy on September 28, 2004, the plaintiff reported that he had not had a seizure in several years. (R. at 171.) Dr. Handy continued his Dilantin prescription for seizures. (*Id.*)

The plaintiff also suffers from a back impairment that was considered by the ALJ. (R. at 15.) The plaintiff testified at the first administrative hearing that he has had back pain since he was young. (R. at 39). An MRI taken on July 12, 2004, revealed "[b]road based protrusions with annular tears at L4-5 and L5-S1," but no significant compression of the thecal sac or nerve roots at either level. (R. at 125.) The reviewing physician opined that the central canal and conus medullaris, neural

foramina, facet joints and posterior elements were all normal. (*Id.*) Dr. Handy then reviewed the results of this MRI and diagnosed the plaintiff with lumbar disc disease. (R. at 118.) He gave the plaintiff a new prescription of Lortab for the pain and referred the plaintiff to a neurosurgeon. (*Id.*)

The plaintiff was first seen by J. Travis Burt, M.D., of Highlands Neurosurgery on July 20, 2004. (R. at 145.) The plaintiff's chief complaint was persistent low back pain. (*Id.*) Dr. Burt reviewed the MRI and described it as "essentially a normal MRI scan with the exception of some disc dehydration at L4-L5 and L5-S1." (*Id.*) Dr. Burt's clinical examination revealed no specific tenderness over the SI joints or greater trochanteric bursa. (*Id.*) He described the plaintiff's maneuver as unremarkable and his gait and station as normal. The sensory examination was also normal. There was no evidence of fasciculations or atrophy. (*Id.*) Based on these findings, Dr. Burt recommended a lumbar epidural steroid block but no surgery. (*Id.*)

Because the plaintiff did not require surgical intervention, Dr. Burt transferred the plaintiff to another physician, William M. Platt, M.D. (R. at 143.) On July 27, 2004, Dr. Platt administered the epidural steroid block recommended by Dr. Burt. (R. at 146.) At a follow-up visit on August 31, 2004, the plaintiff reported "very good but temporary relief with the procedure." (R. at 141.) According to Dr. Platt's notes, the plaintiff got relief from the shot from the time it was given on July 27 until mid-

August. (*Id.*) Dr. Platt's examination revealed no gross atrophy and the ability to forward flex to near ninety degrees. (*Id.*) A focal neurologic exam was similarly normal. (*Id.*) Dr. Platt's report also indicates that the plaintiff had electrodiagnostic studies of the left lower extremity that were normal. (*Id.*) Dr. Platt then recommended another epidural shot, that was performed on September 14, 2004. (R. at 147.) While Dr. Platt prescribed more Lortab, he suggested that this pain medication should be used judiciously. (R. at 142.) He further stated that there was room in the treatment regimen for self-help, including exercise such as walking, smoking cessation, and weight control. (*Id.*)

Finally, the plaintiff's psychological impairment was considered by the ALJ. (R. at 16.) During a January 7, 2004, visit with Dr. Handy, the plaintiff complained of depression going back several years but denied current suicidal ideation. (R. at 121.) Consequently, Dr. Handy diagnosed the plaintiff with depression, prescribed Paxil, and recommended counseling. (*Id.*) At a later appointment on December 9, 2004, Dr. Handy changed the plaintiff's diagnosis to bipolar disorder. (R. at 116.) The plaintiff continued to deny suicidal or homicidal ideation but complained of difficulties sleeping. (*Id.*) He was then prescribed Seroquel. (*Id.*) Despite Dr. Handy's recommendations, the plaintiff did not receive counseling.

In December 17, 2005, the plaintiff had a psychological examination with William Stanley, M.Ed., SPE, at the request of the ALJ. (R. at 172-177.) Clinical psychologist Donald Hiers, Ph.D., reviewed Stanley's results and signed the report. (R. at 177.) In his report, Stanley indicated that the plaintiff denied the use of street drugs but had recently been released from a rehabilitation center in Galax for polysubstance abuse. (R. at 172.) Stanley found the plaintiff's social skills adequate and reported that he related relatively well to the examiner. (R. at 175.) Although Stanley conducted a Personality Assessment Inventory ("PAI"), he questioned the validity of the profile, suggesting that the plaintiff's score was likely the result of carelessness, reading difficulties, confusion, or failure to follow test instructions. (*Id.*)

Stanley diagnosed the plaintiff with polysubstance abuse in remission, moderate major depressive disorder without psychotic features, and moderate generalized anxiety disorder. (R. at 176.) He estimated the plaintiff's Global Assessment of Functioning ("GAF") score to be between 50 and 55,[1] and recommended psychotherapy. (R. at 175-76.)

---

[1] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in social, occupational, or school functioning. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

Stanley also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) signed by Dr. Hiers. (R. at 178-80.) In this assessment, Stanley opined that the plaintiff was not limited in his ability to understand, remember, or carry out either short and simple instructions or even detailed instructions. (R. at 178.) He did find that the plaintiff was moderately restricted in his ability to make judgments on simple work-related decisions, interact appropriately with the public, supervisors, or co-workers, or respond appropriately to work pressures in a usual work setting or changes in a routine work setting. (R. at 178-79.)

The evidence in this case also consists of the testimony of a vocational expert. (R. at 30-32.) When asked by the ALJ to classify the plaintiff's past work, the vocational expert stated that the truck manager position was light and skilled and the customer service representative position was sedentary and skilled. (R. at 30.) The ALJ also asked the vocational expert to consider whether jobs existed in significant numbers for an individual the same age as the plaintiff, with his same education and background, who was restricted to light work activity. The ALJ described light work activity as lifting up to twenty pounds occasionally and ten pounds frequently. (*Id.*) The ALJ asked the vocational expert to further assume that this person was restricted to simple, low stress jobs and could not work around unprotected heights and dangerous equipment or machinery. (*Id.*) In response, the vocational expert testified

-8-

that the plaintiff could work as a sales clerk, cashier, cleaner, or hand packager. (R. at 31.) The vocational expert stated that there were 1,500 sales clerks regionally and 2,500,000 nationwide; 2,500 cashier positions regionally and 3,500,000 nationwide; 400 cleaner positions regionally and 2,000,000 nationwide; and 600 hand packager positions regionally and 750,000 nationwide. (*Id.*)

III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423 (d)(2)(A).

The Commissioner applies a five-step sequential evaluation process in assessing DIB claims. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present

in the national economy. *See* 20 C.F.R. § 404.1520(a)(4) (2007). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id.*; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistences in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff does not argue in his brief that the ALJ's findings regarding his physical impairments were erroneous. This omission is unsurprising since, despite the medical evidence suggesting that the plaintiff's back pain from his degenerative

disc disease can be controlled with anti-inflammatory treatment as well as non-steroidal medication, the ALJ assumed that the plaintiff could lift no more than ten pounds frequently and twenty pounds occasionally. (R. at 15, 30.) The ALJ also noted that the plaintiff's neurosurgeon had not limited his work-related activities, that the clinical and diagnostic findings had yielded minimal to normal results, and that the plaintiff had not required surgery or physical therapy. (R. at 15.)

The plaintiff similarly does not specifically contest the ALJ's finding that, with medication, his seizures are controlled. Despite this finding, the ALJ still considered the seizures in his residual functional capacity determination and limited the plaintiff to light work that did not require exposure to unprotected heights or moving machinery. (R. at 15-16, 30.)

The plaintiff does argue, however, that the ALJ's residual functional capacity determination as to his mental impairment is not supported by substantial evidence. (Br. Supp. Pl.'s Mot. Summ. J. 4-10.) Specifically, he contends that "[i]n offering a finding that [the plaintiff] was capable of engaging in a low stress occupation, the Administration failed to comply with Social Security Ruling 85-15." (*Id*. at 4.) The plaintiff further states, "The problem here is that a job in itself is not inherently stressful or non-stressful. What is incumbent upon the Administration . . . is to

-11-

Case 1:06-cv-00091-JPJ-PMS   Document 23   Filed 01/09/08   Page 11 of 18   Pageid#: 103

determine what are the physical and mental limitations that an individual has . . . ." (*Id.* at 5.)

Despite the plaintiff's narrow characterization of the ALJ's decision, I find that the ALJ did consider the plaintiff's mental limitations and his assessment of these limitations was supported by substantial evidence. As the plaintiff admits, in finding that he was capable of performing simple, low-stress jobs, the ALJ relied on the records from Stanley and Dr. Hiers. (*Id.* at 7; R. at 16.) In particular, the Medical Source Statement of Ability to do Work-Related Activities (Mental) signed by Dr. Hiers and Stanley, states that the plaintiff was not limited in his ability to understand, remember, or carry out either short and simple instructions or detailed instructions, and was only moderately restricted in his ability to make judgments on simple work-related decisions, interact appropriately with the public, supervisors, or co-workers, or respond appropriately to work pressures in a usual work setting or to changes in a routine work setting. (R. at 178-79.)

The plaintiff concedes that this assessment suggests that he has a satisfactory capacity to engage in a number of mental work-related activities, but then argues that the GAF score assigned to him by Stanley indicates that he has a severe impairment. (Br. Supp. Pl.'s Mot. Summ. J. 7.) He states, "The problem here is the GAF at either 50 or from 51-55 is reflective of severe mental impairments." (*Id.* at 8.) While the

-12-

plaintiff is correct that a score of fifty is indicative of serious symptoms or serious impairment in social, occupational, or school functioning, a score between fifty-one and sixty indicates only moderate symptoms or moderate difficulty in such functioning. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

Furthermore, the ALJ considered the GAF score of fifty to fifty-five assigned by Stanley and properly rejected it as inconsistent with Stanley's narrative summary. (R. at 16.) As the defendant correctly argues, "Certainly, it is self-evident that evaluator Stanley's assessment of a GAF of 50, indicating severe symptoms, is inconsistent with the fact that he rated Plaintiff as only moderately limited [in most activities] . . . ." (Def.'s Br. Supp. Mot. Summ. J. 14.) For all other mental work-related activities, Stanley actually found that the plaintiff had no restrictions at all. (R. at 178.)

In short, I find that the ALJ's determination that the plaintiff retained the residual functional capacity to perform simple and low-stress jobs, is supported by substantial evidence, namely Stanley's narrative summary and evaluation, and the absence of other mental health treatment or hospitalization. Because the ALJ asked the vocational expert to consider these mental limitations, I find no error.

IV

The plaintiff has also submitted with his Motion for Summary Judgment a sealed document containing treatment notes from psychologist John W. Ludgate, Ph.D., and records from the plaintiff's treatment at Wellmont Bristol Regional Medical Center in June 2006. (Br. Supp. Pl.'s Mot. Summ. J. Ex. A.) The plaintiff did not begin seeing Dr. Ludgate until June 2, 2006, after the ALJ had issued his decision. Not only was this evidence not submitted to the ALJ, it was also not sent to the Appeals Council and is, therefore, not part of the administrative record. Nevertheless, the plaintiff argues that these new records support his allegations that he suffers from a long standing severe mental impairment. (Br. Supp. Pl.'s Mot. Summ. J. 9-10.)

"Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the [Commissioner's] decision is supported by substantial evidence." *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972). Thus, evidence outside the administrative record that has been submitted for the first time to the district court may only be used to evaluate whether the case should be remanded to the Commissioner and not to reverse the decision of the Commissioner. *See* 42 U.S.C.A. § 405(g). Accordingly, I may only consider the

-14-

sealed exhibit submitted by the plaintiff with his Motion for Summary Judgment to determine whether remand is appropriate in this case.

"A remand on the basis of new evidence is warranted only if the new evidence is material and there is good cause for its late submission." *Hayes v. Astrue*, 488 F. Supp.2d 560, 564 (W.D. Va. 2007). The Fourth Circuit has held that "[e]vidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Wilkins v. Sec'y Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc) (superseded by statute on other grounds). The new evidence must also relate to the claimant's condition on or before the date of the ALJ's decision. *Id.* (citing *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)).

The defendant argues that the plaintiff has failed to satisfy the "good cause requirement" of Section 405(g). Although this evidence was not in existence at the time of the ALJ's decision, the hospital records and some of Dr. Ludgate's notes could have been sent to the Appeals Council before the sixty-day appeal period ran on approximately July 10, 2006. (*See* Def.'s Br. Supp. Mot. Summ. J. 17.) Indeed, the plaintiff was released from the hospital on June 27, 2006. (Br. Supp. Pl.'s Mot. Summ. J. Ex. A.)

The plaintiff's only explanation for the delay is that "[i]t would not have been possible for either [him] or his counsel at that time to get these records to the

-15-

Administrative Law Judge." (Br. Supp. Pl.'s Mot. Summ. J. 9.) The plaintiff fails to set forth an affirmative reason for why he did not attempt to submit the new records to the Appeals Council since it had yet to issue its decision. Because the plaintiff has not shown good cause for failing to send the records to the Appeals Council, I find that the plaintiff has not satisfied the good cause requirement of Section 405(g), and is not entitled to remand. *See* 42 U.S.C.A. § 405(g).

Even assuming arguendo, that I were to find that the plaintiff has met the good cause requirement, the plaintiff must show that the evidence would have changed the ALJ's decision and relates to his condition on or before the decision. *See Wilkins*, 953 F.2d at 96. I find that this new evidence does not relate to the plaintiff's condition on or before May 10, 2006. (*See* Br. Supp. Pl.'s Mot. Summ. J. Ex. A.) At best, the records document a deterioration in the plaintiff's condition since the ALJ's decision. As the Commissioner correctly argues, if the plaintiff believes his condition has deteriorated since the ALJ's decision, the proper remedy would be to file a new application for DIB rather than seek a remand of the current claim. (*See* Def.'s Br. Supp. Mot. Summ. J. 17-18.)

Furthermore, even if I were to find that the new evidence relates to the plaintiff's condition prior to the decision, I find it unlikely that this evidence would have changed the ALJ's decision. While the plaintiff argues that this evidence

-16-

suggests a more severe impairment, the hospital records indicate that the plaintiff was discharged with a GAF score of sixty, even higher than the score given by the psychological evaluator Stanley. (Br. Supp. Pl.'s Mot. Summ. J. Ex. A at 3; R. at 176.) While the ALJ rejected Stanley's GAF score of fifty to fifty-five as inconsistent with his own narrative report, a score of sixty given by hospital staff supports the ALJ's finding that the plaintiff is only moderately limited. (R. at 16.)

Additionally, the new evidence indicates that the plaintiff voluntarily admitted himself to the hospital claiming that he was overwhelmed and reported that his stay had helped him a great deal. (Br. Supp. Pl.'s Mot. Summ. J. Ex. A at 3.) Upon discharge, he denied any suicidal or homicidal ideation. (*Id.*) Thus, while it is true that the plaintiff had never been previously hospitalized for his mental illness, I find that these treatment records indicating that the plaintiff's GAF score had actually improved would not result in a different opinion by the ALJ regarding whether the plaintiff was disabled on or before May 10, 2006. [2] I will consequently deny the plaintiff's request for remand.

---

[2] As mentioned, the plaintiff has also submitted the treatment notes from Dr. Ludgate that unfortunately are difficult to read. These records indicate that when the plaintiff first saw Dr. Ludgate, he was experiencing thoughts of killing himself without specific intent to carry them out, episodes of crying, and feelings of guilt. (Br. Supp. Pl.'s Mot. Summ. J. Ex. A at 18-26.) Despite these subjective allegations, Dr. Ludgate's treatment was rather conservative in nature. Between June 2, 2006, and May 4, 2007, it appears that Dr. Ludgate's only treatment was therapy and medication. (*Id*. at 5-17.) There is no indication in the records that Dr. Ludgate felt that the plaintiff's condition was serious enough to require hospitalization since the June 2006 episode. (*Id*.)

## IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: January 9, 2008

/s/ JAMES P. JONES
Chief United States District Judge